# Richmond

ERVIN QUILLIN v. COMMONWEALTH OF VIRGINIA.

November 14, 1935.

Present, All the Justices.

The opinion states the case.

*S. H. Bond* and *L. P. Fraley,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

BROWNING, J., delivered the opinion of the court.

Ervin Quillin was found guilty of murder in the first degree and his punishment fixed by the jury at sixty years in the penitentiary. The verdict of the jury was sustained by the judgment of the court.

Rhea Curtis, a young man of twenty-seven years, was the victim of the murder charged.

In the year 1932, Curtis and the accused were charged with violation of the State prohibition laws. The accused was tried and found guilty. Curtis testified against him and the case was dismissed as to Curtis. Bad blood ensued thereafter, on the part of the accused against Curtis. This found expression on a number of occasions when the accused told persons that he would "get even" with Curtis, "for swearing a lie on him."

Curtis was last seen alive in the company of the accused and Verland McNutt in Scott county, Virginia. This was on the afternoon and night of March 10, 1934. On that night these three men were at the home of Emmett Gentry, who lives at a village in Scott county called Hiltons. At about 11 o'clock on that night they drove in the automobile of the accused to the home of Harry Stapleton. They stayed there until about 3 o'clock in the morning with a number of other persons, who were listening to the music over the radio and drinking. While there, Vance Vineard overheard the accused say that he was going to whip Rhea Curtis. The three men left the Stapleton home about 3 o'clock in the morning, which was on Sunday, March 11, 1934. About 4 o'clock on the same morning McNutt went to the home of Burton Quillin, an uncle of the accused, for the purpose of borrowing a lantern. Burton Quillin lives off of the main highway on a road that leads from the main highway to the north fork of the Holston river. It is about a mile from Burton Quillin's house to the river.

Rhea Curtis did not return to his home and was not heard of until the 7th of April, 1934, when his body was found some fifteen miles below Hiltons or Burton Quillin's home, having been washed on the shore of an island, in the State of Tennessee, where the two forks of the Holston river converge.

The body was so much decomposed that its identity could not be established by its facial expression. Mrs. Grace Curtis, widow of the deceased, viewed the body shortly after it was discovered and identified her husband

by the color of his hair and by the clothes that he was wearing when she last saw him and which were on the dead body. The clothes included a pair of socks and shoes. In the pocket of the trousers on the body was found a barlow knife which Mrs. Curtis identified as belonging to her husband. The clothes consisting of a coat, waistcoat and trousers were identified by John Sloan, a clerk in the clothing store of Mr. Bolling in Gate City, Virginia, who sold the clothes to Curtis, whose wife accompanied him, when they were purchased. She really selected the suit for her husband. The sheriff of the county testified that the clothes which were in evidence during the trial were the same that were on the dead body that was found on the river bank. The body was further identified by F. H. Maddux who had known Rhea Curtis all of his life and who was present at the coroner's inquest, by the clothing, the color of the hair and by the general appearance. He was asked: "What was there about the body you could identify?", and he answered, "You take a man who has knowed a man as long as I have the features of him."

On March 11, 1934, while going to Sunday school, Fred Agee and Myrtle Agee found a cap at the place where the accused's car had stalled early that morning. This cap was left by them at Burton Quillin's home, where Mrs. Curtis, the widow of the deceased, was given it by Mrs. Burton Quillin. As it was handed to her a piece of paper fell out of it. This piece of paper was identified by Burton Quillin and also by Mrs. Curtis who said that it was like the paper which her husband had under the band of his cap. Mrs. Curtis also identified her husband's shirt and belt as the same which were found on the dead body.

This is before us fortified by the verdict of the jury confirmed by the judgment of the court. The above statement of fact and that hereafter to be presented is based upon the evidence of the Commonwealth which constitutes the light in which we must view it.

■ Thus we think that the identity of the body found as that of the deceased is beyond cavil. Certainly it is a jury question that has been determined against the contention of the accused.

Further as to the manner in which Rhea Curtis met his death.

At about 6 o'clock in the morning, two hours after McNutt, in company with the accused, was at Burton Quillin's home and had borrowed a lantern, McNutt and the accused turned up in Kingsport, Tennessee and ate breakfast at the home of Ketron. Before eating the accused washed his hands in a washpan on the back porch and Ketron's stepdaughter, Neville Dixon, noticed that the water in the pan in which the accused had washed his hands was, "real bloody." George Ketron testified that the accused told him that "he had had a scrap" the night before with Rhea Curtis, which took place near Hiltons and that "he got even with him." Coy Kilbourne, a nephew of Mrs. Ketron, who was there that morning said that the accused told him that he had had a fight "up about Burton Quillin's," that "he knocked him," (Rhea Curtis), "from one side of the road to the other." This witness further said that he saw blood on the accused's hands and some skinned places.

On the same morning at the same place the accused told Pat Dixon that he had had a fight with Rhea Curtis, he said, "I got even with him, I whipped him, I knocked him against the bank and then got him and knocked him against the other bank," and this took place near Burton Quillin's. The two Agees' testified that they found the cap about 9:30 o'clock on the Sunday morning of March 11, "on the other side of the hill from Burton Quillin's."

On March 12, 1934, Monday, B. L. Curtis, a cousin of the deceased had a conversation with the accused at the home of the accused. Curtis testified as follows that he said: "I done what I told you I was going to do, I took advantage of him, because I know he was bad about cutting people, I opened my knife and he come up around

behind me, and I said, Rhea damn you, I'm going to whip you. I said do you want to fight with a gun, knife or what and Rhea said, 'I want to fight fair,' and he said I knocked hell out of him. I knocked him from one side of the road to the other and then he ran."

On Tuesday after the disappearance of Rhea Curtis, Craig Dixon found a piece of sheepskin coat near and east of Burton Quillin's, on the public road that leads from Quillin's house up the river. This piece of coat had blood on it. He also found a handkerchief which had blood on it. The sheriff also testified to the presence of blood on these articles and that it looked to be fresh.

It was also in evidence that during the period between the disappearance of Curtis and the discovery of the body that the north fork of the Holston river had been considerably flushed, and that there were several heavy freshets about that time.

Charley Abshur was an inmate of the Scott county jail while the accused and McNutt were in confinement there. Abshur was in jail for drunkenness and was serving time for nonpayment of his fine. McNutt was taken out of the jail by officers for the purpose of being questioned or quizzed. When he was brought back Abshur listened in and heard the accused ask McNutt what he told them. McNutt said, "nothing much," and the accused replied, "God damn you, you had better not." When the accused was arrested on, March 13, by the sheriff he was wearing a coat from which a piece had been torn, and there was fresh blood on it. The piece of cloth found matched the coat which the accused was wearing.

Two physicians who performed an autopsy on the body testified that the person whose the body it was had a broken neck which would have caused death; that there were blood clots on the brain on the left side which indicated that the person had had a blow causing concussion or something of that character, sufficient to fracture a blood vessel; that the person's face had been beaten up severely, and the frontal bone showed that the prin-

cipal licks had been there. Dr. Wallace testified that the body looked like the person had been clubbed to death, that the whole front part of his face was beaten into a jelly; that the blows on the head could have produced death.

R. H. Bowen, deputy sheriff of Scott county, in making an examination of the accused's car found a crank in it upon which he said there were two or three or four hairs.

The evidence puts the motive for the commission of the crime before us with appalling conviction.

■ We cannot say other than that the nexus of evidence makes the guilt of the accused sure.

■ The accused filed nine assignments of error. The first is based upon the action of the court in refusing to grant a continuance of the case at the April, 1934, term. It is sufficient to say that the reasons urged as to this assignment do not commend themselves to us as possessing serious merit. The matter of a continuance is peculiarly within the discretion of the trial court and under the circumstances presented the court did not abuse its discretion. Second, objection was made to a *venire facias* because the sheriff was required to summon sixteen persons instead of twenty. This was one of three such writs. The original writ contained a list of twenty-four persons, which satisfies the appropriate statute, and the other two, one of which is the basis of the assignment, were supplementary writs. We need say no more about that. The third and fourth assignments of error were based upon the action of the court in admitting the testimony of Grace Curtis that her husband was dead and that it was his body lying there dead. We think there is no error here. The wife was testifying to that which she did, certainly in her judgment, intuitively know. Who could known better than she, with the indicia of identity before her. The fifth assignment of error is based upon the ruling of the court in allowing the clothing found upon the dead man to be exhibited to the jury. We think that this is not error where the clothing introduced serves the pur-

pose of identifying the deceased. See Wharton's Criminal Evidence (10th Ed.) section 941.

The fifth assignment of error number two and the sixth and seventh assignments are without meritorious objection.

We find no error in any of the instructions granted, and excepted to or in the instruction refused and excepted to.

"The way of the transgressor is hard." The penalty here is none too severe to pay for the commission of a revolting crime. "Whatsoever a man soweth, that shall he also reap."

*Affirmed.*